**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BRENDA GOODMAN *on behalf of* KAYLA GOODMAN, | CASE NO. 1:22-CV-00995 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| SOCIAL SECURITY ADMINISTRATION, | <u>**MEMORANDUM OPINION & ORDER**</u> |
| Defendant. | |

Plaintiff Brenda Goodman ("Plaintiff" or "Ms. Goodman") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") filed on behalf of her adult daughter Kayla Goodman ("K.G." or "claimant").[1]  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the matter is before the undersigned pursuant to the consent of the parties.  (ECF Doc. 9.)

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in her evaluation of the opinion of the claimant's treating physician Sumit Parikh, M.D.  Accordingly, the Court **VACATES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion and order.  On remand, the ALJ shall clearly articulate her findings as to the persuasiveness of Dr. Parikh's opinions, specifically explaining how she considered both the supportability factor and the consistency factor, in addition to any

---

[1] Since both Plaintiff and her daughter have the same last names, the Court refers to Ms. Kayla Goodman by her initials or claimant to avoid confusion.

1

other factors considered under the regulations.  The ALJ should also ensure that her decision builds an accurate and logical bridge between the evidence and result.

## I.      Procedural History

On October 24, 2019, Ms. Goodman filed an SSI application on K.G.'s behalf with an alleged disability onset date of February 16, 2001.  (Tr. 46, 648.)  She alleged K.G. was disabled due to mitochondrial disease, short chain Acyl-CoA dehydrogenase deficiency, epilepsy, ASD [autism spectrum disorder], SLD [specific learning disorder], bipolar disorder, anxiety/panic attacks, pulmonary valve stenosis (resolved). (Tr. 544, 550, 663.)  The application was denied at the initial level (Tr. 540-44) and upon reconsideration (Tr. 548-50), and a hearing was requested (Tr. 551-53).

The ALJ conducted a telephonic hearing on October 1, 2020.  (Tr. 476-518.)  The ALJ issued a decision on February 3, 2021, finding that K.G. was not under a disability within the meaning of the Social Security Act since October 24, 2019, the date the application was filed. (Tr. 43-60.)  The Appeals Council denied Plaintiff's request for review on April 7, 2022, making the ALJ's decision the Commissioner's final decision.  (Tr. 1-7.)  Ms. Goodman then filed the pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 11, 13, 15).

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

K.G. was born in 2001.  (Tr. 53, 648.)  She was eighteen years old on the date the application was filed.  (Tr. 53.)  She lived with her mother, Ms. Goodman, who the Cuyahoga County Probate Court appointed as guardian of her person on March 7, 2019.  (Tr. 610-36.) K.G. received services through the Cuyahoga County Board of Developmental Services.  (Tr.

2446-2607.)  K.G. graduated high school in 2020 at the age of nineteen.  (Tr. 491.)  She started

attending Lake Erie College in August 2020 for equine management.  (Tr. 495.)

**B.    Orange City School Records**

K.G. had Individualized Education Plans ("IEP") while attending high school in the

Orange City Schools.  (*See generally* Tr. 730-829.)  She transitioned to high school in fall 2016.

(Tr. 785.)  She met the eligibility requirements as a student with OHI (Other Health Impairment)

Major.  (Tr. 751.)  K.G.'s IEPs indicated she could not become overheated due to her inability to

regulate her body temperature, and that it was critical that she remain hydrated throughout the

school day.  (*See e.g.*, Tr. 730-31, 751, 761.)  Accommodations and interventions included:

modified or reduced school days / work as necessary to address health issues; a regular check-in

schedule for the purpose of monitoring fluid and food intake, temperature, and fatigue during the

school day; clarifications of directions and expectations; extended time to transition to classes;

allowance of food and drinks in classroom; use of calculator; targeted instruction in the areas of

number sense and operations and written expression; and implementation of social-emotional

techniques to help with anxiety, withdrawal, atypicality, and adaptability in the school setting.

(Tr. 731, 732, 740, 747, 758, 769-770, 781, 783, 795-97.)  In February 2018, K.G. had a reduced

schedule, attending school from 11:30 a.m.-2:00 p.m.  (Tr. 783.)  She returned to a full day

schedule in the 2019 academic school year, and had a good year academically.  (Tr. 759.)  For

half of her school day, she attended a business academy excel tech program.  (*Id*.)

K.G. expressed interest in pursuing college after high school, with an interest in equine

and business studies.  (Tr. 759, 762, 783.)  As part of her IEP, she was to be provided instruction

in the college application process, instruction in career technical education in the area of

business, and a referral to Opportunities for Ohioans with Disabilities.  (Tr. 762.)  She was

described as "an amazing, respectful, polite . . . young lady[,] a model student that gives 110%
effort all the time." (Tr. 759, 780.) She was an "avid reader and lover of horses" and she was
"involved in 4H and horse back riding lessons." (*Id*.)

## C.    Probate Court Guardianship

In early 2019, Ms. Goodman filed an application with the Cuyahoga County Probate
Court, seeking to be appointed as guardian for her daughter. (Tr. 613-14, 625-31.) The grounds
for the guardianship application were that K.G. was mentally impaired as a result of a mental
illness or disability and incapable of taking proper care of herself or her property. (Tr. 615.) A
court investigator interviewed K.G. as part of the process and prepared a Court Investigator's
Report on the Proposed Guardianship on March 5, 2019. (Tr. 615-21.)

The court investigator noted the following physical and mental impairments:
developmental disability (mild), autism spectrum, bi-polar disorder (severe), epilepsy, severe
hepatopathy (mitochondrial dysfunction), and pancreatitis. (Tr. 616.) Her medications included
Gedeon and Zoloft. (*Id*.) The court investigator observed that K.G. exhibited impairment in her
memory, concentration, comprehension, and judgment during the interview. (Tr. 616-17.) There
were no observed impairments in orientation, speech, or affect. (*Id*.) The investigator was
unable to assess whether there was impairment in K.G.'s thought process. (Tr. 617.) K.G. could
perform most activities of daily living, but she was unable to handle her personal finances, drive,
or take medications. (Tr. 618.) The investigator considered the Statement of Expert Evaluation
submitted by K.G.'s physician Tatiana Falcone, M.D. (634-36), which included Dr. Falcone's
opinion that K.G. needed assistance making decisions (Tr. 620, 636). The investigator also
considered information regarding K.G.'s recent manic episode, noting that K.G. did "not eat

when in a manic state which puts her in immediate metabolic crisis where her organs start to shut down."  (Tr. 620, 635, 636.)

The investigator recommended a guardianship of K.G.'s person.  (Tr. 620.)  A hearing was held before a Magistrate on March 7, 2019 (Tr. 622-23), and Ms. Goodman was appointed Guardian of K.G.'s person on that same date (Tr. 624).

## D.    Medical Evidence

### 1.    Relevant Treatment History[2]

K.G. presented to her neurologist at the Cleveland Clinic, Sumit Parikh, M.D., for a follow-up appointment on January 18, 2018.  (Tr. 2185.)  Dr. Parikh remarked that he first saw K.G. in 2005 and last saw her more than a year prior, describing K.G. as "an almost 17 year old female with mild developmental disabilities and a constellation of symptoms due to a yet undetermined etiology though lactic acidosis, pancreatitis and severe hepatopathy during an illness and biochemical studies in skin and muscle rais[ing] the concern of primary mitochondrial dysfunction."  (Id.)  Dr. Parikh detailed K.G.'s symptoms and findings at that time, which included: developmental disability, decreasing and mild; epilepsy, possibly resolved with last seizure in 2011; and metabolic decompensations.  (Id.)  Ms. Goodman reported that K.G. had an increase in tantrums and recently went "manic" and was displaying signs of grandiosity and becoming fixated on a school health project that did not seem to exist.  (Tr. 2187.)  Ms. Goodman also reported that K.G. was skipping meals and was very emotional and

_____

[2] Although Ms. Goodman cites to evidence submitted to the Appeals Council (see e.g., ECF Doc. 11, p. 8 (citing Tr. 346); id. at p. 10 (citing Tr. 10-38; id. at p. 16 (citing Tr. 206)), she does not request or seek a sentence six remand. The Sixth Circuit explains: "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."  Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996).  This Court may only consider such evidence as a basis for a sentence six remand, id., which Ms. Goodman does not seek.  Accordingly, the Court has not considered any evidence that was submitted to the Appeals Council but not in the record before the ALJ.

crying all the time.  (*Id*.)  Ms. Goodman noted that her daughter had been seeing a psychologist for years, and said they were going to see the psychologist that day or possibly seek treatment at the emergency room.  (*Id*.)  Dr. Parikh had concern of acute onset delusions and mania and recommended urgent psychiatry consultation.  (Tr. 2188.)

That same day, K.G. was admitted for inpatient psychiatric treatment at the Cleveland Clinic for hypomania and delusions.  (Tr. 1063, 1133.)  Ms. Goodman reported that K.G. was in "'psychosis' with 'gra[n]diose' ideas."  (Tr. 1063.)  Ms. Goodman stated that K.G. thought she was "part of a large research project that [was] going to save the world."  (*Id*.)  K.G. said she was: a "trained equestrian rider"; "training for Olympics"; a "Reiki expert who can turn energy on/off"; and "part of [a] school project that [was] going to save the world."  (Tr. 1064.)  On examination, K.G. was "hyperactive, disorganized, with flight of ideas and loosening associations."  (Tr. 1133.)  She was focused on her Tarot cards and her "supernatural abilities." (Tr. 1133-34.)  She denied depression, anxiety, and suicidal or homicidal ideation.  (Tr. 1133.) She denied current hallucinations, but reported hallucinations in the past.  (Tr. 1133-34.)  It was reported that K.G. had a similar episode of "blurring reality and magical thinking regarding good/bad spirits" when she was seven or eight years old, which had resolved with behavioral intervention.  (Tr. 1133.)  K.G.'s presentation in January 2018 was described as more severe and ongoing since around September  2017, when her mother realized she had written a manuscript on how to ride a horse and describing her ability to ride in very grandiose terms.  (Tr. 1133, 1134.)  K.G.'s symptoms had progressed gradually since September 2017, until her symptoms "acutely worsened with reduced sleep, grandiosity, delusions, fixation on nonexistent projects/relationships, talkativeness/difficult to interrupt, elevated/expansive mood, and hypergraphia (many papers written on in her room)" in January 2018.  (Tr. 1133.)  K.G. was

6

started on Zyprexa and participated in therapy during her admission.  (Tr. 1136.)  She was diagnosed with monopolar mania and bipolar 2 disorder during her admission.  (Tr. 1137.)  She was discharged after one week, on January 25, 2018.  (Tr. 1138.)

K.G. presented to Ambreen Ghori, M.D., at Cleveland Clinic's Child & Adolescent Psychiatry department on February 8, 2018 for a follow-up appointment.  (Tr. 832.)  Dr. Ghori indicated that K.G. did not appear manic during the visit and denied depression.  (Tr. 833.)  K.G. was diagnosed with bipolar disorder type 2. (Tr. 833.)  Dr. Ghori continued K.G. on Zyprexa 5 mg; she advised K.G. to take 2.5 mg when necessary for manic symptoms, but with extreme caution because of the risk of metabolic side effects.  (Tr. 832-33.)

K.G. returned to Dr. Ghori on March 8, 2018.  (Tr. 846-59.)  Ms. Goodman reported that K.G. was taking the "as needed" Zyprexa on most days with no major side effects.  (Tr. 846.)  There were no reported concerns of mania or psychosis, and K.G. was getting along okay with her peers.  (*Id*.)  Mental status examination findings were appropriate and normal.  (Tr. 847.)  K.G. was diagnosed with bipolar affective disorder in remission.  (*Id*.)  She was instructed to continue taking Zyprexa 7.5 mg.  (Tr. 848.)

On March 11, 2018, K.G. presented to the Cleveland Clinic emergency room following a seizure that occurred at home.  (Tr. 1030.)  She was admitted and started on Keppra.  (Tr. 1049.)  She did well with no new seizure episode in twenty-four hours, and was discharged home on March 12, 2018.  (Tr. 1049-50.)

Ms. Goodman presented to Tatiana Falcone, M.D., in the Psyc Child Epilepsy department at the Cleveland Clinic on April 3, 2018.  (Tr. 2357-69.)  Ms. Goodman reported noticing that her daughter was showing "multiple symptoms of anxiety, inability to function alone, constant need for reassurance, [and feeling] overwhelmed in public places."  (Tr. 2357.)  K.G.'s family

was slowly trying to reintroduce K.G. to school.  (*Id*.)  She was attending school for only three hours each day.  (*Id*.)  Ms. Goodman also reported that K.G. continued at times to have "disorganized thoughts, and strong beliefs in supernatural powers (ability to read minds, read other people future, hear the voices of her family members who die, [and] receive guidance by the spirits)."  (Tr. 2357-58.)  Ms. Goodman felt that K.G.'s symptoms were 60% controlled on Zyprexa, but she felt that her daughter's anxiety was getting worse since starting Keppra.  (Tr. 2758.)  Dr. Falcone had to ask Ms. Goodman to leave the room so Dr. Falcone could engage K.G. because Ms. Goodman was answering most of Dr. Falcone's questions.  (Tr. 2364.)  On mental status examination, K.G. was alert and oriented, but avoided eye contact.  (Tr. 2363-64.)  K.G.'s affect was constricted, and she described her mood as "ok."  (Tr. 2364.)  Dr. Falcone described K.G.'s speech and language as underproductive and her thought process as indecisive.  (*Id*.)  Her thought content was immature to her chronological age.  (*Id*.)  She demonstrated no perceptual disturbances.  (*Id*.)  Her memory was intact.  (*Id*.)  There was a slight impairment in her judgment.  (*Id*.)  Her insight was adequate.  (*Id*.)  Dr. Falcone added Zoloft and Vistaril, noting that they might consider cross-tapering Zyprexa.  (Tr. 2358.)

K.G. presented to Dr. Falcone on May 15, 2018, for follow up.  (Tr. 2387.)  She had tapered the Zyprexa and started Gedeon the evening before.  (Tr. 2388-89.)  Her sleep was good and she reported that her grades were good.  (Tr. 2389.)  The severity and functional impact of her symptoms was moderate.  (*Id*.)  On mental status examination, she was alert and oriented and engaged with good eye contact.  (Tr. 2391-92.)  Her affect was appropriate to topic and setting, and her speech, language, thought process, thought content, concentration, judgment, and insight were appropriate.  (Tr. 2392.)  Her memory was intact.  (*Id*.)  K.G. described her mood as "ok."  (*Id*.)  Dr. Falcone instructed K.G. to continue taking Gedeon.  (Tr. 2388.)

During a June 19, 2018 follow up with Dr. Falcone, Ms. Goodman reported that K.G. was doing much better. (Tr. 2397-98.) Ms. Goodman said she noticed K.G. was more engaged, more interested in reading, had less mood lability, had more control of her appetite, and was making better food choices. (Tr. 2398.) K.G. described her mood as "happy" and there were no abnormal mental status examination findings. (Tr. 2400.) Dr. Falcone increased the Gedeon dose and discussed healthy behaviors with K.G., including increasing her amount of exercise. (Tr. 2397.) K.G. compromised on walking the dog at least three times each week and going horseback riding twice each week. (*Id*.)

When K.G. returned to Dr. Falcone on September 10, 2018, she reported: she was excited about excel tech, her sleep was good, she continued to gain weight despite medication changes, her mood was fine, and there were no problems at school. (Tr. 875.) She was scheduled to ride on Tuesday, Thursday, and Saturday and said she would try to go to the lessons (Tr. 875, 879), but she reported she had no motivation for physical activity (Tr. 879). She also reported limited social interaction. (*Id*.) She denied manic symptoms. (Tr. 875.) Mental status examination findings were unremarkable. (Tr. 878.) K.G.'s medications were continued. (Tr. 874.)

K.G. returned to Dr. Falcone the next month, on October 15, 2018. (Tr. 884.) She reported that her anxiety was better, but that large crowds were difficult for her. (Tr. 886.) She was sleeping well and feeling refreshed. (*Id*.) She was hungry all the time. (*Id*.) She reported no hallucinations or delusions. (*Id*.) She wanted to go into the equine program at Lake Erie College. (*Id*.) She reported that her relationship with her mom was good, she had no problems at school, and she was learning at grade level. (*Id*.) She was not exercising and was unable to make friends. (Tr. 890.) K.G. described her mood as "ok" and her mental status examination findings were otherwise unremarkable. (Tr. 889.) Her medications were continued. (Tr. 885.)

9

During a January 3, 2019 follow-up visit with Dr. Falcone, K.G. reported that her appetite was better, but she was "snapping" and getting frustrated easily. (Tr. 903.) She reported symptoms of mania, including racing thoughts, expansive thinking and mood, and mood lability. (*Id*.) She also reported sleep issues. (*Id*.) On mental status examination, her insight was fair. (Tr. 906.) Her mental status examination findings were otherwise appropriate and normal. (*Id*.) Dr. Falcone increased K.G.'s Gedeon and referred K.G. for a sleep study. (Tr. 902.)

K.G. presented to Kenneth Zahka, M.D., at the Cleveland Clinic on February 12, 2019 for a consultation regarding her history of pulmonary stenosis and metabolic defect. (Tr. 999.) Dr. Zahka found that K.G.'s examination was consistent with very mild pulmonary stenosis and moderate pulmonary regurgitation, which was also shown on her 2017 echocardiogram. (Tr. 1001.) K.G. had mild RV dilatation with preserved systolic function. (*Id*.) Dr. Zahka found that overall K.G. had "an excellent course following pulmonary valvuloplasty." (*Id*.) He felt her prognosis was good, and that her future risk for pulmonary valve replacement was very low. (*Id*.) He recommended that she follow up in two years. (*Id*.)

K.G. underwent Trio Whole Exome Sequencing (WES) at the recommendation of Cleveland Clinic physician Adnan Alsadah, M.D., after extensive genetic testing and metabolic workup were unrevealing as to the cause of K.G.'s disease. (Tr. 995.) Ms. Goodman met with Dr. Alsadah on February 20, 2019 to discuss the WES results. (Tr. 992.) K.G. did not attend the appointment because Ms. Goodman did not want her to miss school. (*Id*.) Ms. Goodman reported that K.G. had some additional mania symptoms, such as difficulty following conversations. (*Id*.) K.G. was getting help with studying, note taking, and speaking. (*Id*.) Ms. Goodman reported she was in the process of seeking guardianship. (*Id*.) The sequencing showed no causative variants in disease genes associated with the reported phenotype, but

revealed some information not revealed by prior genetic testing.  (Tr. 995.)  Dr. Alsadah discussed the results with Dr. Parikh, who agreed that SCADD by itself did not explain K.G.'s clinical phenotype.  (*Id.*)  Follow up with genetics was recommended in two years.  (*Id.*)

K.G. presented to Dr. Parikh for follow up on July 17, 2019.  (Tr. 976-79.)  She was doing well, but reported that she had been tired.  (Tr. 978.)  She was planning on attending "Hole in the Wall" camp again in the summer.  (*Id.*)  She reported periods when she felt run down and shaky, especially when at camp, but said she would take a break and sit in the air-conditioning. (*Id.*)  She reported completing eleventh grade on an IEP and making honor roll.  (*Id.*)  She said she would remain in the vocational business program when she returned to school for twelfth grade.  (*Id.*)  She was contemplating attending community college with an interest in rehabilitating abused horses.  (*Id.*)  She had one breakthrough seizure in March 2018 and was restarted on medicine.  (*Id.*)  Her EEG remained non-epileptiform.  (*Id.*)  Her pulmonic stenosis was stable.  (*Id.*)  A physical examination showed no abnormal movements or tremors, a normal gait, and no ataxia. (Tr. 979.)  Dr. Parikh's impressions were: stable metabolic disease; treated psychiatric disease; treated epilepsy; excessive sleepiness with snoring; and heavy periods, raising the question of iron deficiency.  (*Id.*)  Dr. Parikh recommended checking K.G.'s iron levels, a sleep consult, and follow up in six to nine months.  (*Id.*)

K.G. presented to Dr. Falcone on August 14, 2019.  (Tr. 948-54.)  She reported that she had traveled to Seattle.  (Tr. 950.)  She had been horseback riding.  (*Id.*)  She reported her sleep and appetite had been okay.  (*Id.*)  She was using CBD hemp oil at night.  (*Id.*)  She complained of difficulty controlling worry.  (*Id.*)  On mental status examination, K.G. described her mood as "good."  (Tr. 953.)  Her mental status examination findings were normal.  (*Id.*)  Dr. Falcone continued K.G.'s Gedeon and reduced her Zoloft.  (Tr. 949, 950.)

11

When K.G. saw Dr. Falcone on September 23, 2019, she reported that her appetite was better since decreasing Zoloft.  (Tr. 960.)  She was trying to use the treadmill daily.  (*Id*.)  She reported that school was going okay.  (*Id*.)  She was getting all A's.  (*Id*.)  She was in a regular Chemistry class and doing okay.  (*Id*.)  She reported feeling tired occasionally.  (*Id*.)  She continued to report having difficulty controlling worry.  (*Id*.)  Mental status examination findings were normal.  (Tr. 962-63.)  Dr. Falcone was tapering Zoloft and continuing Gedeon.  (Tr. 959.)

K.G. attended a video visit with Dr. Parikh on July 29, 2020.  (Tr. 2435.)  She was doing well, had graduated from high school, and planned to attend Lake Erie College for equine entrepreneurship to rehabilitate abused horses.  (Tr. 2437.)  She reported her energy levels were "good" but that she could fatigue if pushed.  (*Id*.)  Ms. Goodman reported K.G. had some leg-cramping that improved with the use of creatine powder.  (*Id*.)  K.G.'s sleep was improved.  (Tr. 2438.)  An observational examination showed that K.G. was alert and interactive, with fluent speech.  (*Id*.)  No abnormal movements were observed and her gait was normal.  (*Id*.)  Dr. Parikh recommended that K.G. continue with her current care and follow up in six to nine months.  (*Id*.)

K.G. participated in group (Tr. 2628-29, 2634-36, 2639-40, 2643-44, 2653-56, 2659-60, 2663-66, 2672-73) and family psychotherapy (Tr. 2610-27, 2630-33, 2637-38, 2641-42, 2645-50, 2657-58, 2661-62, 2667-71, 2674-75) with Christina Ren, LISW, at Partners for Behavioral Health & Wellness from July 2019 through at least July 2020 (Tr. 2610-74).[3]  Her primary diagnosis was generalized anxiety disorder.  (*Id*.)  A July 8, 2020 therapy note reflects that Ms. Goodman and K.G. disagreed about the requirements of the equine management program:

> Kayla has a belief that the college program will give her an exemption if she is not as strong as required. Mo[ther] keeps saying this is a "able body program" and if you cannot do the work you are asked to leave. Kayla has her high school mentality that she will get modifications to her programs so that her chance of success [is] increased – not true in this horse program.

[3] Some sessions were teletherapy sessions due to Covid-19.  (*See e.g.*, Tr. 2611-12, 2614, 2617, 2620, 2626.)

(Tr. 2610.)

K.G. met with Dr. Falcone on June 22, 2020.  (Tr. 2172-77.)  She reported that she was teaching her horse how to ride a carriage.  (Tr. 2173.)  She also reported her sleep was good, but Ms. Goodman reported seeing her on the monitor waking up in the middle of the night.  (*Id*.)  K.G. was making better food choices.  (*Id*.)  She had returned to physical therapy and was doing yoga.  (*Id*.)  She reported her mood was good, she was not feeling hopeless or helpless, and she had no suicidal or homicidal ideation.  (*Id*.)  Examination findings were normal.  (Tr. 275-76.)  Dr. Falcone continued her prescription for Geodon and recommended a sleep study.  (Tr. 2172.)

### E.    Cuyahoga County Board of Developmental Disabilities

As noted in Section II.A., *supra*, K.G. received services through the Cuyahoga County Board of Developmental Services.  (Tr. 2446-2607.)  Case management notes from September 25, 2019, reflect that "[t]he major concern for [K.G.] [was] her mitochrondrial disorder, which limit[ed] her stamina, temperature threshold, and require[d] her to stay very hydrated and eat at least every 3 hours."  (Tr. 2473.)  It was noted that her condition was mainly "controlled by diet and exercise" but K.G. required "prompting from others to maintain her regimen[]" and she was not able to "independently identify or notice signs . . . that she [was] in metabolic distress."  (*Id*.)  Ms. Goodman was requesting respite services one evening a week and on occasional Sundays each month when she could not be present at home with her daughter.  (Tr. 2474.)  The case manager noted that Ms. Goodman planned to follow up with a counselor regarding reasonable potential for a part-time job over the summer in 2020.  (*Id*.)

K.G. worked part-time for a few weeks at a public library in July 2020.  (Tr. 2427-32.)  The vocational placement was coordinated by Hope Works, LLC.  (*Id*.)  K.G. struggled initially with her stamina, but was able to work a four-hour shift with a possible fifteen-minute break

once she was comfortable with the work site and her work schedule.  (Tr. 2431.)  She was offered a position with the library at the conclusion of her placement.  (Tr. 2429.) She declined the offer, explaining to the manager that she was starting college.  (*Id*.)

### 2. Opinion Evidence

#### i. Treating Source

On August 28, 2020, Dr. Parikh completed an Off-Task / Absenteeism Questionnaire (Tr. 2420) and a Seizures Residual Functional Capacity Questionnaire (Tr. 2421-23).

In the absenteeism questionnaire, Dr. Parikh opined that the K.G. would be off task 20% of the day.  (Tr. 2420.)  He explained that she would be off-task due to the following reasons: underlying impairments of developmental disability, mitochondrial cytopathy, and epilepsy; and "energy levels are good, but she can fatigue if pushed." (*Id*.)  Dr. Parikh also opined that K.G. would be absent from work two days per month and that all the severity of her limitations existed since at least October 24, 2019.  (*Id*.)

In the seizure questionnaire, Dr. Parikh explained that K.G.'s seizures were generalized tonic-clonic type, but she was seizure free since March 2018.  (Tr. 2421, 2422.)  He explained that she did not always have warning of an impending seizure.  (Tr. 2422.)  Heat, exertion, and illness were identified as precipitating factors for a seizure.  (*Id*.)  Postictal manifestations could last for several hours to two days and included confusion and an inability to speak or use arms/hands.  (*Id*.)  Dr. Parikh indicated that K.G.'s seizures were treated with Keppra.  (*Id*.)  Dr. Parikh opined that K.G.  would need to take unscheduled breaks once or twice during an eight-hour day for thirty to sixty minutes.  (Tr. 2423.)  He also opined that she would be absent from work about once a month and she would be off-task 20% of the time for the same reasons identified in the Off-Task / Absenteeism Questionnaire.  (*Compare* Tr. 2423 *with* Tr. 2420.)

### ii.     State Agency Medical Consultants

On January 31, 2020, state agency medical consultant Gerald Klyop completed a Physical RFC Assessment.  (Tr. 524-25.)  Dr. Klyop opined that K.G. had no exertional, manipulative, visual, or communicative limitations.  (Tr. 524.)  He opined that she had postural and environmental limitations as follows: never climb ladder, ropes, or scaffolds and avoid all exposure to hazards due to seizures / history of epilepsy.  (Tr. 524-25.)

On reconsideration on May 15, 2020, state agency medical consultant Gary Hinzman, M.D. agreed with Dr. Klyop's limitations, but added additional environmental limitations.  (Tr. 532-33.)  He opined that K.G. would have additional limitations of: avoidance of concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation.  (Tr. 533.)

### iii.     State Agency Psychological Consultants

On January 12, 2020, state agency psychological consultant Sandra Banks, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 522-23) and Mental RFC Assessment (Tr. 525-26).  Dr. Banks opined that K.G. had no limitations in her ability to interact with others and moderate limitations in her ability to understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 523.)  Dr. Banks opined that K.G. had the mental residual functional capacity to: understand and remember simple and some moderately complex instructions; carry out a learned routine that does not involve fast paced production demands; and adapt to a structured and predictable work setting with infrequent changes in responsibilities and expectations.  (Tr. 525-26.)

State agency psychological consultant Aracelis Rivera, Psy.D. upon reconsideration on June 9, 2020 affirmed Dr. Bank's findings.  (Tr. 531, 533-34.)

15

**E.      Hearing Testimony**

**1.      Plaintiff's Testimony**

Before taking testimony, the ALJ inquired about Ms. Goodman's guardianship over K.G. (Tr. 482-86.)  The ALJ ultimately determined that she could not accept testimony from K.G. because she was found not competent in the guardianship proceedings.  (Tr. 484-85.)  K.G. therefore did not testify.  Instead, Ms. Goodman offered testimony on behalf of her daughter. (Tr. 485-86, 491-503.)  K.G. was not present for her mother's testimony.  (Tr. 486.)

Ms. Goodman testified that K.G. had graduated from high school in the spring of 2020. (Tr. 491.)  She started attending college in the fall of 2020.  (*Id*.)  Plaintiff's counsel initially indicated that K.G. did not have any accommodations in college.  (*Id*.)  Ms. Goodman clarified that K.G. did have accommodations in college.  (*Id*.)  She said that her daughter had "extended time on assignments and testing, small group clarification.  Basically, the same thing she had in high school they are providing."  (Tr. 492.)  She said that her daughter needed the accommodations because: she needed clarification on items, it took her a little bit longer to process things, she needed more time to develop and answer, and she wrote slower.  (Tr. 498.) Ms. Goodman said that K.G. was able to graduate from high school and start college because she worked very hard.  (*Id*.)  K.G. got overwhelmed and stressed out about schoolwork and it affected her mentally and physically to the point where she had tantrums and shut down about once a week.  (Tr. 498-99.)  Those episodes lasted from ten minutes to an hour or more.  (Tr. 499.)  Ms. Goodman explained she did not have written documentation of the accommodations being provided by the college, but said she would see what documentation she could obtain.  (Tr. 492-93, 517.)  The ALJ explained that she would provide Plaintiff and her counsel time to obtain documentation that reflected the accommodations that K.G. was receiving in college.  (*Id*.)

16

Ms. Goodman explained that K.G. did not "have the same energy that a typical person would" because of her metabolic disorder.  (Tr. 493-94.)  She said K.G. "fatigue[d] really pretty easily."  (Tr. 494.)  Although K.G. was happy, Ms. Goodman said she had to make sure K.G. was eating and drinking throughout the day, and that K.G. needed frequent reminders to do so. (*Id*.)  Ms. Goodman explained that K.G. had to eat something every two to three hours to "stay metabolically stable," and had to drink something—a sip or two of a drink—every twenty minutes.  (*Id*.)  Ms. Goodman said K.G. once had a watch she used to remind her to eat and drink, but started to ignore the reminder cues and did not really feel the watch vibrate.  (Tr. 494-95.)  When the watch broke, they did not replace it.  (*Id*.)  Ms. Goodman estimated she had to remind her daughter to eat or drink two or three times each day.  (Tr. 494-95.)  K.G.'s metabolic condition affected her ability to naturally regulate her body temperature.  (Tr. 497.)  Hot weather, which for K.G. began in the mid-70s, affected her quickly.  (*Id*.)  Cold weather also created body temperature regulation issues for K.G.  (*Id*.)  Ms. Goodman explained that being too hot or too cold affected K.G.'s body like stress or other physical conditions, which could cause her to go into a "metabolic crisis, which is a life threatening condition."  (Tr. 497-98.)

K.G. was attending college at Lake Erie College in person.  (Tr. 495.)  She was studying equine management.  (*Id*.)  She initially rode horses as part of the program.  (*Id*.)  However, Ms. Goodman said K.G. became unqualified to ride because she could not meet the physical strength and stamina requirements.  (*Id*.)  Although she could not ride in the college program, she was riding horses.  (*Id*.)  They owned a horse.  (Tr. 496.)  K.G. started riding horses when she was three or four years old.  (*Id*.)  She rode once a week at a therapeutic horse-riding farm that specialized in special needs riding for children and adults.   (Tr. 495-96.)  K.G. was capable of riding English or Western, but Ms. Goodman explained that K.G. had started to learn to drive a

17

cart because her stamina for riding was not increasing.  (Tr. 496.)  She estimated that K.G. could ride a horse for about thirty minutes.  (*Id*.)  Ms. Goodman said K.G.'s stamina for riding had progressed over time, but was not always the same.  (Tr. 497.)  For example, K.G. might only be able to ride for ten minutes if the was really hot outside.  (*Id*.)

Ms. Goodman said social interaction was a struggle for K.G.  (Tr. 500.)  She had one good friend who attended school at a different college.  (*Id.*)  She reported making friends at school, but did not really socialize with her peers.  (*Id*.)  Although K.G. was nineteen years old, Ms. Goodman said she was more like a fourteen- or fifteen-year-old socially.  (*Id*.)  Ms. Goodman had to remind K.G. daily to take care of her personal hygiene.  (Tr. 501.)  She also had to remind K.G. to do her chores, which included helping with her service dog.  (*Id*.)  K.G. had the service dog since she was nine years old.  (*Id*.)  She got the dog to help her socially.  (*Id*.)

Ms. Goodman felt K.G.'s anxiety and mood were relatively well-controlled with therapy. (Tr. 502.)  She did feel however that K.G. struggled with realizing when she was stressing out or getting overwhelmed.  (*Id*.)  K.G. did not have her driver's license and never attempted to get it because she was "overwhelmed about the idea, about driving, so she [chose] not to."  (Tr. 503.)

## 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 503-16.)  The ALJ explained that there was no past work, and asked the VE to assume a hypothetical individual of the same age and education as K.G. who had no exertional limitations, but was limited as follows:

> climbing ramps and stairs is going to be frequent; occasional ladders, ropes, or scaffolds; no unprotected heights or moving mechanical parts; never operate a motor vehicle; occasional exposure to weather, humidity, and wetness, extreme cold, extreme heat; simple routine and repetitive tasks, but not at a production rate pace, meaning assembly line work; simple work-related decisions; frequent interaction with supervisors, co-workers, and the general public.

(Tr. 504.)  The VE testified that there were jobs available in the national economy, including marker, mail clerk, and linen room attendant.  (Tr. 504-05.)

For her second hypothetical, the ALJ asked the VE to assume the first hypothetical with the following additional seizure precaution limitations: no working around open bodies of water, no swimming jobs, no working with sharp objects or fire, and no working around flashing lights or strobe lights.  (Tr. 506.)  The VE testified that the jobs identified in response to the first hypothetical would remain available.  (*Id*.)

For her third hypothetical, the ALJ asked the VE to assume the limitations contained in the second hypothetical except with the following modifications and additional limitation: occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; and reasoning, math, and language levels limited to level 1.  (Tr. 507.)  The VE testified that there would be no jobs available.  (Tr. 507-08.)  However, the following jobs would be available if the environmental limitations were removed: cleaner housekeeping and sorter.  (Tr. 508-10.)

For her fourth hypothetical, the ALJ asked the VE to assume the limitations contained in the second hypothetical with the following changes: occasional rather than frequent interaction with the public and coworkers.  (Tr. 510-11.)  The VE testified that the jobs identified in response to the first two hypotheticals would remain available.  (Tr. 511.)

For her fifth hypothetical, the ALJ asked the VE to consider the limitations contained in the fourth hypothetical with the following changes: no contact with the public and occasional contact with supervisors.  (Tr. 511.)  The VE testified that the jobs identified in response to the fourth hypothetical would remain available.  (*Id*.)

For her sixth hypothetical, the ALJ asked the VE to assume the limitations contained in the fifth hypothetical except with the following change: no contact with coworkers.  (Tr. 511-

12.)  The VE testified that limiting the individual to no contact with coworkers would be work preclusive.  (Tr. 512.)

The ALJ then asked the VE whether there would be jobs available for any of the previously outlined hypotheticals if the individual required occasional reminders from a supervisor.  (Tr. 512.)  The VE testified that such a limitation would be work preclusive because all jobs would be accommodated if there was a requirement for reminders.  (*Id.*)  Next, the ALJ asked whether the following limitations, if added to any of the hypotheticals, would affect the availability of jobs: "[i]n addition to normal breaks, [the] person must be able to eat a snack every two hours and take a drink every 20 minutes[.]"  (*Id.*)  The VE testified that there would be no jobs available, explaining it would require a workplace accommodation to allow the individual to drink every twenty minutes; the snacks were not a problem because the timing would generally fall within the normal breaks provided to employees.  (Tr. 512-13.)  As to the need to drink every twenty minutes, the ALJ clarified that she envisioned the individual keeping a drink at her workstation and reaching over to grab the drink by extending her arm.  (*Id.*)  With that clarification, the VE said that the jobs identified, i.e., cleaner housekeeping, sorter, linen room attendant, mail room, and marker, "probably would be available for the person."  (*Id.*)

The VE testified that there would be no jobs available if an individual would be off-task 20% or more of the workday or would miss two or more days of work per month.  (Tr. 514.)  The VE also testified that there would be no jobs available if any of the hypotheticals were limited to work at the SVP 1 level.  (Tr. 514-16.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and

vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her February 3, 2021 decision, the ALJ made the following findings:[4]

1.    The claimant has not engaged in substantial gainful activity since October 24, 2019, the application date.  (Tr. 48.)

2.    The claimant has the following severe impairments: bipolar disorder in remission, monopolar mania, generalized anxiety disorder, nonintractable epilepsy without status epilepticus, and mitochondrial metabolism disorder short chain acyl-CoA dehydrogenase deficiency (SCADD).  (Tr. 48-49.) Congenital pulmonary valve stenosis, pancreatitis, and mild expressive and receptive speech delays were not severe impairments.  (Tr. 49.)

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 49-50.)

4.    The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations.  Claimant can occasionally climb ramps and stairs, and never climb ladders, ropes and scaffolds.  Claimant can never work at unprotected heights and never work around moving mechanical parts.  She can never operate a motor vehicle.  Claimant can perform work with occasional exposure to weather, humidity, wetness, extreme cold, and extreme heat.  Claimant is able to perform simple, routine, repetitive tasks, but not at a production rate pace (meaning assembly line work).  She is limited to simple work-related decisions.  Claimant is frequently able to interact with supervisors and occasionally interact with coworkers and the public.  She cannot work around open bodies of water or swimming pools. She cannot work with sharp objects or fire.  She cannot work around flashing lights or strobe lights.  In addition to normal breaks, the claimant must be able to eat a snack every two hours and take a drink every twenty minutes.  (Tr. 50-53.)

5.    The claimant has no past relevant work.  (Tr. 53.)

6.    The claimant was born in 2001 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

---

[4] The ALJ's findings are summarized.

7.      The claimant has at least a high school education.  (*Id*.)

8.      Transferability of job skills is not an issue because the claimant does not
        have past relevant work.  (*Id*.)

9.      Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform, including marker, mail
        clerk, and linen room attendant.  (Tr. 54.)

Based on the foregoing, the ALJ found K.G. had not been under a disability, as defined in

the Social Security Act, since October 24, 2019, the date the application was filed. (Tr. 54.)

## V.      Plaintiff's Arguments

Ms. Goodman argues that the ALJ's decision is not supported by substantial evidence

because: (1) the ALJ's assessment of K.G.'s symptom allegations did not comply with the

requirements of SSR 16-3p; (2) the ALJ did not properly evaluate or articulate the

persuasiveness of the opinions of Dr. Parikh; and (3) according to the VE's testimony, an

individual with the RFC that the ALJ assessed could not perform competitive work without an

accommodation.  (ECF Doc. 11, pp. 13-24; ECF Doc. 15.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical

24

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

The Court addresses Ms. Goodman's assignments of error out of turn, finding merit to her second assignment of error.

**B.      Second Assignment of Error: Whether ALJ Properly Evaluated Medial Opinion of Treating Provider Dr. Parikh**

In her second assignment of error, Ms. Goodman argues that the ALJ failed to properly consider the persuasiveness of the opinions of K.G.'s treating neurogeneticist Dr. Parikh. (ECF Doc. 11, pp. 18-22, ECF Doc. 15, pp. 2-4.)

**1.      Legal Framework for Evaluation of Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence specify that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). The regulations also provide that the SSA "*will* articulate in [the] determination or decision how persuasive [it] find[s] *all* of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added). The SSA "*will* consider those medical opinions . . . using the factors listed in paragraphs (c)(1) through (c)(5) of . . . section [416.920c], as appropriate." 20 C.F.R. § 416.920c(a) (emphasis added); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2). ALJs must explain

how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 416.920c(b)(2).

The undersigned turns to whether the ALJ's evaluation of the challenged medical opinions satisfied the regulatory framework for evaluation of medical opinion evidence.

### 2.    Whether ALJ Properly Evaluated Dr. Parikh's Opinions

The ALJ considered Dr. Parikh's opinions, stating:

> Sumit Parikh, M.D., completed as off-task/absenteeism questionnaire on August 28, 2020. He indicated the claimant will be off task 20% of the day. Her energy levels are good, but she can fatigue if pushed[]. She would be absent from work 2 days per month []. Dr. Parikh also completed a seizure residual functional capacity questionnaire the same date. Claimant's last breakthrough seizure was in March 2018. He indicated the claimant would need to take unscheduled breaks during an 8-hour day and would be absent once a month []. <u>These opinions are not supported. The record does not show a need for excessive doctor's appointments, counseling, etc.</u>

(Tr. 53 (citations omitted) (emphasis added).)

Ms. Goodman contends that the ALJ's analysis of Dr. Parikh's opinions fails for various reasons, including: (1) the analysis is inadequate because the ALJ failed to articulate how persuasive she found the opinions (ECF Doc. 11, p. 21; ECF Doc. 15, pp. 2-3); and (2) the analysis does not comply with the regulatory requirement that the ALJ explain how she considered both consistency and supportability, since the "ALJ did not consider the required supportability factor beyond a vague statement that the opinions are not supported."[5]  (ECF Doc. 11, p. 22; ECF Doc. 15, pp. 3-4.)  The Commissioner argues in response that the ALJ's failure to state how persuasive she found Dr. Parikh's opinions was not reversible error because the ALJ considered the consistency and supportability of the opinions.  (ECF Doc. 13, pp. 10-14.)

---

[5] Ms. Goodman also argues that the ALJ did not address the "specialization" factor when discussing Dr. Parikh's opinion.  (ECF Doc. 11, p. 21.)  However, she acknowledges that the ALJ was not required to do so under the regulations.  (*Id*.)  Given this acknowledgement and the Court's determination that remand is warranted for the reasons explained herein, the Court declines to address this ancillary argument.

It is undisputed that the ALJ in this case failed to articulate how persuasive she found Dr. Parikh's opinions, as is required by the regulations. *See* 20 C.F.R. § 416.920c(b). Nevertheless, the Commissioner argues the ALJ's failure to articulate the persuasiveness of Dr. Parikh's opinions does not require remand because the ALJ considered the consistency and supportability of Dr. Parikh's opinions. (ECF Doc. 13, p. 10 (relying on *Mitchell v. Comm'r of Soc. Soc. Adm.*, No. 1:20-cv-00430, 2021 WL 1146923, at *10 (N.D. Ohio Jan. 15, 2021).) Plaintiff argues to the contrary, that the ALJ failed to adequately explain her consideration of supportability and therefore failed to build an accurate and logical bridge between the evidence and the result, and further that the Commissioner improperly relied on "post hoc rationalization[s]" to explain the ALJ's reasoning. (ECF Doc. 15, pp. 2-4.) The Court therefore turns now to the pertinent questions—whether the ALJ sufficiently addressed the supportability of Dr. Parikh's opinions as required by the regulations and whether the ALJ built an accurate and logical bridge between the evidence and the result.[6]

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support . . . her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

Here, the ALJ stated only that Dr. Parikh's opinions "are not supported." (Tr. 53.) Her subsequent statement that the "record does not show a need for excessive doctor's appointments, counseling, etc." (*id.*) does not address supportability. At most, this statement appears to address

---

[6] Ms. Goodman does not argue that the ALJ erred in addressing the consistency of the opinion. Accordingly, the Court considers only whether the ALJ properly considered and addressed the supportability factor.

consistency, which considers how consistent an opinion is "with the evidence from other medical sources and nonmedical sources."  20 C.F.R. § 416.920c(c)(2).  Thus, the Court is left only with the ALJ's vague statement that the opinions "are not supported."  This statement fails to "explain how" the ALJ "considered the supportability . . . factor."  20 C.F.R. § 416.920c(b)(2).

The Court is not required to scour the record in search of records to support an ALJ's decision.  *See Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011) ("It is not . . . . the district court's role, to scour the record for evidence and expert reasoning which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it.") (emphasis in original).  Instead, "[a]gency actions 'must be upheld ... on the basis articulated by the agency itself,'" *Foltz obo R.B.K.F. v. Comm'r of Soc. Sec.*, No. 23-3362, 2023 WL 7391701, at *4 (6th Cir. Nov. 8, 2023) (internal citation omitted), and "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration," *Blackburn v. Colvin*, No. 5:12CV2355, 2013 WL 3967282, at *8 (N.D. Ohio July 31, 2013) (internal citation omitted) (brackets in original).  Because the arguments advanced by the Commissioner to explain the basis for the ALJ's finding that Dr. Parikh's opinions were not supported (ECF Doc. 13, pp. 11-12) were not first articulated by the ALJ, they are rejected by this Court as post hoc rationalizations.

The Court also finds the Commissioner's reliance on *Mitchell* (ECF Doc. 13, p. 10) to be misplaced.  Although the ALJ in *Mitchell* did not explicitly categorize "the extent to which the opinions . . . [we]re persuasive," that court found no error in the persuasiveness analysis because the ALJ properly "considered the consistency and supportability" of the opinions.  2021 WL 1146923, at *10.  Indeed, the ALJ in *Mitchell* had considered both the findings in the provider's

treatment records and "the weight of the [other] objective and subjective evidence of record." *Id.* Here, in contrast, the ALJ both failed to articulate how persuasive she found the treating opinions and failed to articulate how—if at all—she considered the supportability of the opinions under the regulations.  Thus, the Court is unable to meaningfully review the decision to determine whether it is supported by substantial evidence.  *See e.g.*, *Melinda C. v. Comm'r of Soc. Sec.*, No. 2:22-CV-1729, 2022 WL 4354999, at *9 (S.D. Ohio Sept. 20, 2022) (finding "failure to discuss the persuasiveness of [doctor's] opinion require[d] remand because 'without fuller explanation, this court cannot engage in meaningful review of the ALJ's decision'") (quoting *Jacob B. v. Comm'r of Soc. Sec.*, No. 1:20-CV-617, 2022 WL 130761, at *8 (S.D. Ohio Jan. 14, 2022)).

Because the ALJ failed not only to make an explicit finding regarding the persuasiveness of Dr. Parikh's opinions—as required by the regulations—but also failed to explain how she considered the supportability of those opinions—as also required by the regulations—the Court finds the ALJ failed to create an accurate and logical bridge between the evidence and the result with respect to the persuasiveness of Dr. Parikh's absenteeism opinion.  *See Fleischer*, 774 F. Supp. 2d at 877; *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (explaining that an ALJ's analysis "should be specific enough to permit the court to trace the path of the ALJ's reasoning") (citations omitted).

Thus, for the reasons set forth in above, the Court finds Ms. Goodman's second assignment of error to be well-taken.

**C.     First and Third Assignments of Error Need Not Be Addressed, as Subjective Symptoms and the Step Five Determination Will be Newly Assessed on Remand**

Ms. Goodman also argues that ALJ's decision lacked the support of substantial evidence because: (1) the ALJ did not properly evaluate K.G.'s subjective symptoms allegations as required by SSR 16-3p (ECF Doc. 11, pp. 13-18; ECF Doc. 15, pp. 1-2); and (2) VE testified that

that an individual having the RFC as assessed by the ALJ could not perform competitive work without an accommodation (ECF Doc. 11, pp. 22-24; ECF Doc. 15, pp. 4-5).  The Court finds it to be unnecessary to address these additional arguments herein.  On remand, the ALJ will be given a new opportunity to evaluate K.G.'s subjective symptoms and will make a new Step Five determination based on the evidentiary record before the Commissioner at that time.

### VII.    Conclusion

For the foregoing reasons, the Court **VACATES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion and order.  On remand, the ALJ shall clearly articulate her findings as to the persuasiveness of Dr. Parikh's opinions, specifically explaining how she considered both the supportability factor and the consistency factor, in addition to any other factors considered under the regulations.  The ALJ should also ensure that her decision builds an accurate and logical bridge between the evidence and result.

February 14, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge